IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

STACY ELLIOTT                                                        PLAINTIFF

V.                                          NO. 10-3054

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration          DEFENDANTS

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Stacy Elliott, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of the Social Security Administration (Commissioner)

denying her claims for a period of disability and disability insurance benefits (DIB) and

supplemental security income (SSI) benefits under the provisions of Titles II and XVI of the

Social Security Act (Act).  In this judicial review, the Court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision.  See

42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed her applications for DIB and SSI on April 18, 2006, alleging

an inability to work since March 6, 2002, due to "back, neck, left hip, rt. ankle, depression, brain

injury."  (Tr. 171-172, 176).  For DIB purposes, Plaintiff maintained insured status through

September 30, 2007.  (Tr. 172).  An administrative hearing was held on April 9, 2008, at which

Plaintiff appeared with counsel, and she and her mother testified.  (Tr. 20-76).

By written decision dated August 15, 2008, the ALJ found that Plaintiff had an

impairment or combination of impairments that were severe - mood disorder, history of cervical

-1-

fracture with medically related pain, and headaches. (Tr. 86). However, after reviewing all of the evidence presented, she determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 87). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that while the claimant can frequently lift and/or carry ten pounds, and occasionally twenty pounds, sit (with normal breaks) for a total of about six hours in an eight hour work day, and stand and/or walk (with normal breaks) for about six hours in an eight hour work day, she cannot climb ladders, scaffolds, or ropes and she should not operate motor vehicles as part of her work. The claimant should not be exposed to unprotected heights or dangerous equipment/machinery. The claimant can only occasionally climb ramps or stairs, stoop, bend, crouch, crawl, kneel, or balance. The claimant must work where instructions are simple and non-complex; interpersonal contact with co-workers and the public is incidental to the work performed; the complexity of tasks is learned and performed by rote; the work is routine and repetitive; there are few variables; little judgment is required; and the supervision required is simple, direct, and concrete.

(Tr. 89). With the help of a vocational expert (VE), the ALJ determined that Plaintiff could perform other work, such as a poultry deboner, poultry eviscerator, and poultry dresser. (Tr. 94).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on April 8, 2010. (Tr.1-3). Subsequently, Plaintiff filed this action. (Doc. 1). This case has been referred to the undersigned for report and recommendation, both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 9, 10).

## II.    Evidence Presented:

Plaintiff was born in 1971 and completed the eighth grade in school. (Tr. 26, 171). On March 6, 2002, while Plaintiff and her husband were living in Florida, they were involved in a one-car accident, and Plaintiff sustained serious injuries. There are several records from North

Broward Hospital District, indicating the nature and severity of her injuries. A cervical spine x-ray revealed dislocation of C5 and C6, several contusions of both lungs with fracture of right 11th and 12th ribs, and Plaintiff was connected to a ventilator for a while. (Tr. 278). Her left hip was also dislocated. (Tr. 279). A neurosurgical consultant reviewed a brain scan and concluded that although it was of suboptimal quality due to the positioning in the scanner, the scan showed no evidence of focal brain injury, no extraaxial or intraaxial injury, no blood, no shift and no mass effect. (Tr. 284). In addition, his initial evaluation found Plaintiff to have the inability to communicate effectively, she responded with eye opening, and was moving her upper extremities spontaneously. (Tr. 284). After review of the radiologic studies and clinical examination, the doctor concluded that Plaintiff had a severe cervical spinal cord injury, that Plaintiff's neck was out of position, and urgent realignment was indicated. (Tr. 287). A surgical procedure was performed, wherein Gardner-Wells tongs were placed under the skull, and eighteen pounds of gentle traction was given in order to realign the neck. (Tr. 291).

An x-ray of the lumbar spine revealed no evidence of vertebral body fracture, and an x-ray of Plaintiff's right ankle revealed a lateral malleolar fracture, posterior tibial fracture. (Tr. 313, 322). From March 7, 2002, to March 24, 2002, CT scans and x-rays were taken daily to determine Plaintiff's progress. (Tr. 327-364, 371-375). There is also a Rehab Consultation Report dated March 11, 2002, which indicates Plaintiff engaged in physical therapy. (Tr. 288-290). However, no further physical therapy records are contained in the record.

The next medical record that appears in the transcript is dated March 7, 2006, when Vann A. Smith, Ph.D., conducted a Neuropsychological Evaluation. (Tr. 401-405). In the evaluation, Dr. Smith stated that Plaintiff reported "occasional" ethanol consumption and smoked "one pack

-3-

of cigarettes per day and consumes 3 caffinated[sic] beverages per day on average." (Tr. 401).

Dr. Smith reported that in overview, there was no compelling clinical or historical evidence of ongoing psychotic illness, disabling anxiety disorder, active primary addictive disorder or personality pattern disturbance.  (Tr. 404).  However, Dr. Smith also found that Plaintiff's clinical history, mental status examination and neuropsychodiagnostic test profile data revealed a pattern of consistently abnormal findings, compatible with the diagnosis(es) of:

> Brain Dysfunction, Secondary to TBI and Sequale Thereof;
> Cognitive, Dysfunction, Non-psychotic, Secondary to Axis III (General Medical) Condition(s);
> Mood Disorder, Secondary to Axis III (General Medical Condition(s);
> Borderline Intellective Function;
> TBI with Grade III Concussion, Secondary to MVA:
> R/O: Temporal-Limbic Seizure (Partial Complex Seizure/PTE)
> Pain Syndrome, Non-psychogenic (orthopaedic).

(Tr. 404).

In a Mental RFC Questionnaire that was completed for Plaintiff's attorney, Dr. Smith diagnosed Plaintiff as follows:

> Axis I:        301.2/294.10/293.83[1]
> AxisII:        V62.89[2]
> Axis III:      TBI:[3]r/o PTE chronic pain
> Axis IV:       Moderate/chronic/progressive
> Axis V:        Current GAF: 40-45
> Highest GAF Past Year: 75-80
> Prognosis: Fair

(Tr. 408).  Dr. Smith further found that Plaintiff was "limited but satisfactory" in ten categories

---

[1]The Court is unsure what diagnosis Dr. Smith is referencing with 301.2 and 294.10, and 293.83 is listed in Diagnostic and Statistical Manual of Mental Disorders 21 (4th ed. 2000) as a type of Mood Disorder.

[2]The Court believes V62.89 refers to Religious or Spiritual Problem.  Id. at 853.

[3]The Court is unsure what acronym Dr. Smith is referencing, but suspects it is "traumatic brain injury."

-4-

AO72A
(Rev. 8/82)

of mental abilities and aptitudes needed to do unskilled work, and particular types of jobs, "seriously limited, but not precluded" in six categories, and "unable to meet competitive standards" in nine categories of mental abilities and aptitudes needed to do unskilled work, semiskilled, and skilled work. (Tr. 410). He reported that Plaintiff's chronic, non-psychogenic (orthopaedic) pain was a significant etiologic factor, that Plaintiff had a low IQ or reduced intellectual functioning, and that Plaintiff's impairments would cause Plaintiff to be absent from work more than four days per month. (Tr. 411).

On September 5, 2006, Plaintiff visited the McCoy Chiropractic office, reporting symptoms of dull, aching, throbbing, pounding and constricting bilateral temporal headaches. (Tr. 414). It was noted that Plaintiff had made sporadic improvement, however generalized, obtaining progressive relief of symptoms. The report stated: "These type injuries are subject to episodes of remission and exacerbations caused by various aggravations from activities of daily living." (Tr. 421).

On August 30, 2006, a General Physical Examination was performed by Dr. Hassan Najeeb Albataineh, at the request of the Social Security Administration. (Tr. 429-435). With respect to Plaintiff's orthopedic abilities, Dr. Albataineh found Plaintiff's range of motion as follows:

Cervical Spine: Flexion 30 degrees out of 50 degrees
                    Extension - 30 degrees out of 60 degrees
                    Rotation - 50 degrees out of 80 degrees (R&L)
Lumbar Spine: 70 degrees out of 90 degrees
Normal straight-leg raising

(Tr. 432). Dr. Albataineh found Plaintiff's range of motion in her extremities to be normal, and that she could perform all limb functions. (Tr. 432-433). Dr. Albataineh's diagnosis was:

> multiple joints pain;
> s/p car accident;
> h/o cervical vertebrae fracture;
> depression;
> migraine headache

(Tr. 435).  He also found that Plaintiff had moderate limitations in her ability to walk, stand, lift and carry.  (Tr. 435).

On August 30, 2006, AP and Lateral lumbar spine x-rays were taken and revealed some mild degenerative changes, and no compressive injury or disk narrowing.  (Tr. 436).

On September 10, 2006, Dr. Bill F. Payne, a non-examining consultant, completed a Physical RFC Assessment.  (Tr. 437-444).  Dr. Payne found that Plaintiff could occasionally lift and/or carry (including upward pulling) 50 pounds;  frequently lift and/or carry (including upward pulling) 25 pounds;  stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday;  sit (with normal breaks) for a total of about 6 hours in an hour workday;  and push and/or pull ( including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry.  (Tr. 438).  Dr. Payne further found that Plaintiff could frequently climb ramps, stairs, ladders, ropes, scaffolds;  and balance, kneel and crawl;  and could occasionally stoop and crouch.  (Tr. 439).  No visual, manipulative, communicative or environmental limitations were established, and Dr. Payne recommended a medium RFC with occasional stooping/crouching.  (Tr. 440-441, 444).

On November 2, 2006, a Mental Status Examination and Evaluation of Adaptive Functioning was performed by Charles Nichols, Psy.D.  (Tr. 448-452).    Dr. Nichols reported that Plaintiff's gait and posture were both normal, and that Plaintiff was employed as a cake decorator at Harp's Supermarket in Yellville, where she worked 20-25 hours per week.  (Tr.

448).   Regarding Plaintiff's allegation of head injury, she did not offer many details to Dr.

Nichols, and her mother added that a CT scan after the 2002 accident led to a diagnosis of

"traumatic brain injury." (Tr. 448).   Dr. Nichols reported that Plaintiff did not have a physician

or take any prescription medications, and that Plaintiff stated she could not afford medical

treatment or medication without health insurance.  (Tr. 449).  Plaintiff reported to Dr. Nichols

that she drank one beer about six days prior and that she consumed about one 8-ounce mixed

drink every evening - Pepsi mixed with Jim Beam.  She also told Dr. Nichols that about one

night per week, she drank about 24 ounces of mixed drinks.  "One good tall drink and it loosens

my neck up."  (Tr. 449).  Plaintiff added that she drank more heavily in the past, stating that she

drank in social situations "but it was out of hand."  (Tr. 449).  She told Dr. Nichols that she now

"drinks at home by myself and I know it's not good.  Now I blow it off as okay because I'm very

uncomfortable."  (Tr. 449).  Plaintiff also reported that she smoked marijuana approximately one

month prior, and admitted enjoying marijuana.  "If it was legal, and it was around, I'd use it quite

a bit."  (Tr. 449).  Plaintiff estimated that she used marijuana about twice per week, and smoked

about 10 to 20 regular cigarettes per day.  (Tr. 449).

Dr. Nichols reported that Plaintiff's IQ was 80 or above and that her concentration and

mental pace were very poor.  (Tr. 451).  As far as diagnostic impression, Dr. Nichols reported:

> At this time, Mrs. Elliott's presentation and self-report provide sufficient
> evidence to warrant a diagnosis of a depressive disorder.  She also reports significant loss
> of memory and executive functioning that suggest the possibility of an acquired cognitive
> disorder.  However, Mrs.. Elliott admits drinking a substantial quantity of liquor nightly
> as well as smoking marijuana on a regular basis.  There is some suspicion that she may
> also be underreporting her actual use of these substances.  It is reasonable to suspect that
> her continuing substance use could be exacerbating or causing her cognitive and
> depressive conditions.  Therefore, Depressive Disorder NOS is diagnosed along with a
> rule-out of Cognitive Disorder NOS.   The claimant would need substance abuse

treatment with sustained abstinence in order to make a definitive diagnosis to explain her cognitive deficits.

> Axis I:        Alcohol Dependence in Partial Sustained Remission
> Cannabis Abuse
> Depressive Disorder NOS
> Rule Out Cognitive Disorder NOS
> AXIS II:        Diagnosis Deferred
> Axis III:        Remote History of Closed Head Trauma, Spinal Injuries, Chronic Pain (per claimant only)
> Axis IV        Occupational and Financial Problems, problems with access to Healthcare
> Axis V;        GAF - 52 (current)
> Prognosis - The course of her depressive and cognitive symptoms is difficult to reliably predict without a differential diagnosis and as long as she continues to abuse substances.
> Additional Comments - The claimant is currently working 20-25 hours per week.
> She indicated that her work performance is good, although she is primarily limited for physical reasons. She shows the capacity to remember and understand simple directions or repetitive job processes. Based on her history, she will likely continue to interact appropriately with work peers.

(Tr. 452).

On November 15, 2006, a Psychiatric Review Technique form was completed by Brad F. Williams, a non-examining consultant. (Tr. 460-473). Dr. Williams found that Plaintiff had mild restriction of activities of daily living and in difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration. (Tr. 470). He recognized that a "neuro-psy" evaluation was performed in March of 2006, but questioned this evaluation, "given the lack of much evidence of significant cognitive deficits." Dr. Williams stated that a more recent MSCE suggested "A/D abuse and depression." He noted that Plaintiff was working 20-25 hours weekly in a supermarket, and that it seemed that her deficits would not prevent her from working full time. (Tr. 472).

Dr. Williams also completed a Mental RFC Assessment on November 15, 2006, where he found Plaintiff was not significantly limited in 16 out of 20 categories and moderately limited in 4 out of 20 categories. (Tr. 453-454). He further found that Plaintiff was able to perform work where interpersonal contact was routine but superficial, e.g. grocery checker; where complexity of tasks was learned by experience, with several variables; where Plaintiff used judgment with limits, and where supervision required was little for routine, but detailed for non-routine. (Tr. 455).

On March 8, 2007, a Case Analysis was completed by Jerry Mann, who reported that he had reviewed all the evidence in the file, and that the assessment of September 10, 2006, was affirmed. (Tr. 474). On March 9, 2007, a Case Analysis was completed by Jerry R. Henderson, who reported that he had reviewed all the evidence in the file, and that the assessment of November 15, 2006 was affirmed, as written. (Tr. 481).

On October 24, 2007, a Mental Diagnostic Evaluation and Adaptive Functioning examination was performed by Dr. Nancy J. Toombs. (Tr. 483-489). Dr. Toombs reported that Plaintiff was quite dramatic and histrionic, and made sweeping statements about being in pain "everyday of her life" and about how she would like to find her husband "a younger woman." (Tr. 484). Dr. Toombs reported that it was very difficult for her to get symptoms, and that all of Plaintiff's symptoms were very vague and nondescript. (Tr. 484). Plaintiff reported that her current job was at Harp's grocery store, where she was a cashier, working anywhere from two to eight hours a day, 20-25 hours a week. (Tr. 485). After inquiring about Plaintiff's alcohol intake, Dr. Toombs concluded that she was unable to get a clear answer from Plaintiff about her use of marijuana and alcohol. (Tr. 485-486). Plaintiff reported to Dr. Toombs that she had not

-9-

had any marijuana in a year-and-a-half, and then it was only because a friend gave her some.

Plaintiff did not remember how much she was using "before or after her accident in 2006,"[4] and

told Dr. Toombs that she smoked one-half of a pack of cigarettes per day.  (Tr. 486).  Dr.

Toombs reported that it was very difficult for Plaintiff to stay focused, and that she did not like

to provide specifics.  Dr. Toombs further reported that Plaintiff's cognition probably would fall

in the low average range.  (Tr. 486).

        In her report, Dr. Toombs stated that since Plaintiff was complaining of confusion and

the fact that she has had a traumatic brain injury in the past, she took the liberty of administering

the CARB (Computerized Assessment of Response Bias) test.  (Tr. 487).  Plaintiff's level of

performance was the "CARB Type III Very Poor Effort."  Dr. Toombs gave the following

interpretation from the CARB manual in regard to Type III:

> (This person gave very poor effort on this test.  The performance was in the range of
> persons making minimal effort or not attending to the task {random responding}.  This
> effort was very far below that expected from either normal controls or persons with
> verified brain impairment.  It is extremely unlikely that even an individual who has
> sustained a severe brain injury would perform this poorly in the absence of symptom
> exaggeration or malingering issues.  This profile is frequently obtained by individuals
> who are attempting to simulate, exaggerate or malinger cognitive deficits.  This poor
> performance may be associated with a variety of reasons which cannot be determined on
> the basis of this test alone.  It is very likely that litigation or other issues of primary or
> secondary gain are motivating factors in this individual's response bias.  The clinician
> will have to consider all of the clinical and psychometric factors to arrive at the best
> clinical decision as to the cause of this poor performance.).

(Tr. 487).  Dr. Toombs gave the following diagnostic impression:

| Axis I: | Depressive disorder NOS; |
|---|---|
| Axis II: | Histrionic traits; |
| Axis V: | 55 |

---

[4]Since it is clear that the accident occurred in 2002, the Court can only presume this is a typographical error.

-10-

(Tr. 488). Dr. Toombs further reported that Plaintiff did simple cooking and could do laundry and housekeeping as she was physically able; and that she cared for her animals; was socially adequate; was able to communicate in an intelligent and effective manner; and that her capacity to cope with work appeared to be good. She noted that Plaintiff was employed at that time. (Tr. 488). Dr. Toombs also found that Plaintiff's ability to sustain concentration on tasks appeared to be fair to good, that she did not have overt difficulty with task persistence, and that any difficulties she had with tasks during the interview may have been due to questionable motivation. (Tr. 488). Dr. Toombs concluded that Plaintiff did not have mental health issues that would require extra time in completing tasks.

Finally, Dr. Toombs did not feel that Plaintiff may have been completely open and honest in regard to her alcohol and drug history. (Tr. 489). Although Dr. Toombs did believe that Plaintiff did have some legitimate depression, she noted that there were many differences between the information Plaintiff was providing to her, and the Mental Diagnostic evaluation that was performed in 2006 by Dr. Nichols. (Tr. 489). "I believe today that we have symptom exaggeration. I also believe that we have symptom exaggeration in regard to cognitive disability as reported by the CARB." (Tr. 489). Dr. Toombs stated that Plaintiff also did not provide symptoms without her having to provide Plaintiff with direct questions to confirm or deny, which put many issues into question as well. (Tr. 489).

Dr. Toombs also completed a Medical Source Statement of Ability to do Work-Related Activities on October 24, 2007, wherein she found that Plaintiff had mild limitation in understanding and remembering complex instructions, carrying out complex instructions, and the ability to make judgments on complex work-related decisions. She also found that

-11-

depression might cause difficulty with carrying out complex instructions. (Tr. 490). She did not believe Plaintiff had any problems interacting with the public, supervisors, co-workers, or responding appropriately to usual work situations and changes in a routine work setting. (Tr. 491).

A record from Mountain Home Christian Clinic dated December 19, 2007, indicates that Plaintiff was prescribed Zoloft for her depression. (Tr. 493).

In a May 29, 2006 Work History Report, Plaintiff indicated that her previous work experience was as a kennel supervisor from 1986 to 1991; an assembler in 1992; a veterinarian technician for some years between 1992 and January of 2006; and as a tile setter for her husband's company from August 1996 to May of 2002. (Tr. 195). In Plaintiff's "Pain and Other Symptoms" report dated May 29, 2006, Plaintiff reported that her neck and left side were always tight, her lower back always hurt, her ankle, foot and ribs hurt, and that the pain in her neck and back lasted all day. (Tr. 203). She reported that she did not take any medications because she could not afford them. (Tr. 204).

In a Function Report-Adult, dated May 29, 2006, Plaintiff reported that on a daily basis, she walked, fed and bathed her animals, did the laundry, and tried to organize her paperwork. (Tr. 205-206). She reported that she could not make good decisions, that noise was irritating, she forgot short term memory problems, was depressed, could not stand for a long time, and that her neck pinched. (Tr. 206). She once again stated that she could not afford medicine. (Tr. 207). She reported that she shopped for groceries once a week, watched television, spent time with her niece and nephew, and did not go anywhere on a regular basis. (Tr. 208-209). She indicated that her attention span had become shorter, she did not follow spoken instructions well,

-12-

or handle changes in routine well.  (Tr. 210-211).

In Plaintiff's February 6, 2007 Pain and Other Symptoms and Function Report - Adult, Plaintiff reported that she could stand/walk for 10 minutes, could not lean on anything made of wood, tried to just take care of her animals, go to work, and do some dishes and laundry.  (Tr. 227-229).

At the hearing held on April 9, 2008, Plaintiff testified that she worked only five-hour shifts two or three days a week, or 10 to 15 hours a week,  "because I can't do it anymore."  (Tr. 42).  She also said that she did intend to continue working at Harp's.  (Tr. 43).  She testified that she was on Zoloft, and that it seemed to work pretty well for a little while, "but I don't know if I need to go back to that free clinic and...if they need to up it or maybe change it to a different type or something."  (Tr. 52).   Plaintiff also testified that doctors wanted to put screws and a plate in her ankle and she said "I don't want surgery. I can't afford surgery.  I don't want anymore metal in my body." (Tr. 54).  Plaintiff testified about the circumstances relating to her visit to Dr. Toombs, stating that Dr. Toombs seemed quite cold to her, and that she was given pages with maybe 100 questions on them to complete, and that the lobby where she was to complete them was very noisy, with people talking and vacuuming the floor.    (Tr. 59).  Plaintiff's attorney also stated that the situation at Dr. Toombs' office was not conducive to someone who had a " cognitive disorder to be able to take a test and have valid results." (Tr. 60).  He therefore suggested that Dr. Toombs' report should not be considered a valid assessment of Plaintiff.  (Tr. 60).

Plaintiff's mother also testified about Plaintiff's condition since the motor vehicle accident, stating that Plaintiff was not happy, was very confused and forgetful, limped, had

-13-

migraines, and that she had not gone to more doctors because she could not afford anymore. (Tr. 63). She stated that Plaintiff could not get comfortable sitting, became tired and started hurting when she stood or walked, and that Plaintiff did most of the housework. (Tr. 66-67). Plaintiff's mother also testified that Dr. Toombs' environment was not suitable for Plaintiff to be able to answer the questions in the documents that were given to her. (Tr. 67).

### III.   Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A),

-14-

1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity (RFC).  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

## III.   Discussion

Plaintiff raises three arguments on appeal: 1) That the ALJ erred by not giving Vann Smith's opinion more weight;  2) the ALJ erred by not finding Plaintiff's cognitive disorder a "severe impairment;" and 3) the ALJ's decision was not supported by substantial evidence.

### A.  Impairments

The ALJ found that Plaintiff suffered from the following severe impairments - Mood disorder, history of cervical fracture with medically related pain, and headaches.  Plaintiff

-15-

contends that even if the report of Dr. Vann Smith is discounted,[5] there is evidence in the record of Plaintiff's complaints of sadness, confusion, poor memory, and difficulty concentrating, and that Dr. Nichols rated Plaintiff's concentration and mental pace as very poor.  (Doc. 9 at p. 20).

Dr. Smith is the only one to diagnose Plaintiff with cognitive dysfunction, among other things.  Nine months later, on November 2, 2006, Dr. Nichols examined Plaintiff, and his diagnosis was Alcohol Dependence in Partial Sustained Remission; Cannabis Abuse; Depressive Disorder NOS;  and "Rule Out Cognitive Disorder NOS." Dr. Nichols reported that there was some suspicion that Plaintiff may have been underreporting her actual use of alcohol and marijuana, and that it was reasonable to suspect that her continuing substance use could be exacerbating or causing her cognitive and depressive conditions.  He believed that Plaintiff would need substance abuse treatment with sustained abstinence in order to make a definitive diagnosis to explain her cognitive deficits.  (Tr. 452).  On November 15, 2006, non-examining consultant Brad F. Williams diagnosed Plaintiff with Affective Disorders and Substance Addiction Disorders.  One year later, on October 24, 2007, Dr. Toombs diagnosed Plaintiff with Depressive Disorder NOS and Histrionic traits, gave Plaintiff a GAF score of 55, and said she had low average cognition.

An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities.  Kirby v. Astrue, 500 F.3d 705, 707-708 (8th Cir. 2007).  If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two.  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007).  It is the claimant's burden to establish

---

[5]The weight given to Dr. Smith's opinion will be more fully discussed below.

that his impairment or combination of impairments are severe.  <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 852 (8th Cir. 2000).  In <u>Buckner v. Astrue</u>, No. 10-1524, 2011 WL 2803017 (July 19, 2011), the Eighth Circuit stated that in determining whether a claimant's mental impairments are "severe," the regulations require the ALJ to consider:

> "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. § § 404.1520a(c)(3), 416.920a(c)(3), 416.920a(c)(3).  The regulations further provide:
>
>> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

<u>Id.</u> at *6.[6]

In his Psychiatric Review Technique form, Dr. Williams found that Plaintiff had mild restriction of activities of daily living and difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration.  In her Mental Diagnostic Evaluation and Adaptive Functioning report, Dr. Toombs reported that Plaintiff did simple cooking;  laundry and housekeeping;  shopping;  cared for her animals;  had regular contact with her family;  was socially adequate (noting that she believed Plaintiff's abilities were much more sophisticated than what she was seeing that day); was able to communicate in an intelligent and effective manner; had good capacity to cope with work (she was employed at that time); and her ability to sustain concentration on tasks appeared to be fair to good.  Dr. Toombs noted that Plaintiff

---

[6]The Court notes that the Court in <u>Buckner</u> dealt with the situation where the ALJ found that none of claimant's mental impairments were severe, and in the present case, the ALJ did find Plaintiff's mood disorder was severe.  However, the Court believes the language in <u>Buckner</u> is instructive.

did not have overt difficulty with task persistence that day, and Dr. Toombs believed that any difficulties Plaintiff had with a task during the interview may have been due to questionable motivation.

The Court notes that the ALJ addressed Plaintiff's challenge to the validity of Dr. Toombs evaluation because of all of the distractions Plaintiff experienced at Dr. Toombs' office. However, the ALJ believed, and the Court agrees, that there is substantial evidence on the record as a whole to support the ALJ's conclusion as to what constituted Plaintiff's severe impairments.

### B.  Weight Given to Dr. Vann Smith's Opinion:

Plaintiff argues that the ALJ erred in her statement that Dr. Smith's opinion is not from an accepted medical source under the CFR, and erred in dismissing his report which was based on objective tests and accompanied by a detailed analysis. (Doc. 9 at p. 14).  In her decision, the ALJ addressed Dr. Smith's opinion, as well as the two letters sent by Dr. Smith, dated April 11, 2008 and July 30, 2008.  (Tr. 92).  The ALJ stated that she gave little weight to the statements and opinions of Vann A. Smith "to the extent they conflict with other verifiable objective medical evidence of record, render opinions on issues reserved to the Commissioner as set out in SSR 96-5p and 20 C.F.R. § 404.1527, and are not shown to be provided by an acceptable medical source consistent with 20 CFR § 404.1513(2)."

In his brief, the Commissioner acknowledges that the ALJ erred in concluding that Dr. Smith's opinions were not shown to be provided by an acceptable medical source, because a licensed or certified psychologist qualifies as an acceptable medical source under the regulations. (Doc. 10 at 5-6).  However, Defendant further argues that this error is "harmless error" because the ALJ set forth two other valid reasons for giving Dr. Smith's opinions little weight.  The

-18-

AO72A
(Rev. 8/82)

Court agrees.

As noted by Defendant, courts have affirmed decisions in which one-time examination reports from Dr. Vann Smith were accorded little weight. See Hudson v. Barnhart, 2005 WL 1560249, *1 (8th Cir. Jul. 6, 2005)("The ALJ gave good reasons for his resolution of the conflict between the mental RFC opinion of Dr. Smith versus those of consulting psychologist Paul Iles and the agency reviewing psychologists"). In Clement v. Barnhart, 2006 WL 1736629 (8th Cir. June 26, 2006), the Eighth Circuit concluded that the ALJ properly discounted the RFC assessment in Dr. Smith's report "after finding it was not supported by his own testing and evaluation, or by other medical evidence in the record, and was inconsistent with Clement's reported daily activities." Id. at *1. District Courts in the Western District of Arkansas have affirmed the ALJ decisions which accorded little weight to Dr. Vann Smith's opinions. See Cole v. Astrue, 2009 WL 3158209, *8 (W.D.Ark. Sept. 29, 2009)(held that Dr. Smith's opinion was inconsistent with the remaining medical evidence of record); Partee v. Astrue, 2009 WL 2987398, *1 (W.D. Ark. Sept. 14, 2009)(held that the ALJ clearly recited the evidence of record and why he gave more weight to the findings of Dr. Bunting over that of Dr. Smith); Haarstad v. Astrue, 2009 WL 2324711, *5 (W.D. Ark. July 27, 2009)(held that the ALJ set forth several reasons in his analysis for not giving significant weight to the opinions of Dr. Smith). The court in Cole also found that the ALJ was not biased against Dr. Smith, but merely pointed out the "inconsistencies within Dr. Smith's assessment and the inconsistencies between Dr. Smith's assessment and the other medical evidence of record." 2009 WL 3158209 at *8, n.1. The undersigned is of the opinion that this is exactly what the ALJ did in the present case. She noted that Dr. Smith's opinion was in conflict with other verifiable objective medical evidence of

-19-

record, such as the evaluation and assessment given by Dr. Toombs, Dr. Charles Nichols, and Dr. Brad Williams, as well as Plaintiff's daily activities, including the fact that Plaintiff works 20-25 hours per week at Harp's.  The Court believes there is sufficient evidence to support the ALJ's finding that little weight should be given to Dr. Smith's opinion.

### C.  Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In the present case, the ALJ stated that after considering the evidence of record, she found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms.  However, she also found that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC, and proceeded to discuss the reasons for her credibility findings.

The ALJ accurately noted the injuries Plaintiff's sustained in the 2002 accident.  She also noted that a brain scan showed no evidence of focal brain injury, no extra-axial or intra-axial

-20-

injury, no blood, no shift and no mass effect.  Further, the hip dislocation was reduced by the trauma surgeon.  The ALJ properly noted that rehabilitation treatment was ordered, but records of that treatment were not included in the medical evidence of record.  The ALJ discussed Dr. Albataineh's general physical examination results, wherein Dr. Albataineh assessed Plaintiff as moderately limited in her ability to walk, stand, lift and carry.  The Court notes, as the ALJ, that there are no medical records indicating Plaintiff received any treatment after her 2002 accident until 2006.

Further, Plaintiff's subjective complaints are inconsistent with evidence regarding her daily activities, which the ALJ discussed at length. Plaintiff reported that she could take care of her dogs, cats, and horses, wash dishes, do the laundry, drive a car, and do most of the housework.  She also testified that subsequent to the 2002 accident, she and her husband drove from Florida to Arkansas, stopping only once. In addition, Plaintiff has sought very little medical treatment for her pain, and her contention that she cannot afford medical treatment or medication is less than credible.   Plaintiff put forth no evidence to show that she had been denied treatment, due to her lack of funds.  Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992).  In addition, the record reflects that Plaintiff visited the Mountain Home Christian Clinic one time and received a prescription for Zoloft, and she testified that this was a free clinic.  There is also evidence showing that Plaintiff continues to smoke and drink alcohol, and the Court therefore cannot say that her financial situation prevented her from receiving medical treatment.  Failure of the Plaintiff to seek medical treatment strongly weighs against her subjective claims of pain and limitation and has been held to be inconsistent with allegations of pain. See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003);  Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir.

2003);  Novotny v. Chater, 72 F.3d 669, 671 (8th Cir. 1995) (per curiam).

After reviewing the administrative record, it is clear that the ALJ properly evaluated Plaintiff's subjective complaints.

**D.  Residual Functional Capacity**

RFC is the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, after considering all of the symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and opinion evidence, the ALJ found that Plaintiff could perform light work with certain limitations. This opinion is supported by the medical evidence of record.  Dr. Albataineh found Plaintiff had only moderate limitations in her ability to walk, stand, lift and carry, and Dr. Payne found Plaintiff would be able to perform medium work with occasional stooping and crouching.

-22-

Although Dr. Albataineh found some limited range of motion in Plaintiff's cervical and lumbar spine, the limitations set forth in the ALJ's RFC do not require her to climb ladders, scaffolds, or ropes.  Further the RFC mandates that Plaintiff should not operate motor vehicles or be exposed to unprotected heights or dangerous equipment/machinery, and can only occasionally climb ramps or stairs, stoop, bend, crouch, crawl, kneel, or balance.  Additionally, Plaintiff is working 10-15 hours per week at Harp's.  Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work, and there is no medical evidence of record suggesting that Plaintiff's conditions have worsened since the 2002 accident.   See Schultz v. Astrue, 479 F. 3d 979, 982-83 (8th Cir. 2007);  Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir.2005);  Gowell v. Apfel, 242 F.3d 793, 798 (8th

The Court believes the ALJ's RFC finding  fully sets forth Plaintiff's ability to function in the workplace, and that there is substantial evidence to support the ALJ's RFC findings.

### E.     Hypothetical Proposed to Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ proposed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court believes that the VE's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing other work as a poultry deboner, poultry eviscerator, and poultry dresser.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

-23-

IV.     **Conclusion:**

Based on the foregoing, the Court recommends that the ALJ's decision be affirmed and the Plaintiff's case be dismissed with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 5th day of August, 2011.


/s/ *Erin L. Setser*
_____
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-24-